IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEPHANIE SCHULTZ, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 24-618 |
| | ) |
| AEROTECH, INC. and AEROTECH, INC. | ) |
| EMPLOYEE STOCK OWNERSHIP PLAN | ) |
| And TRUST COMMITTEE, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

This matter involves a challenge to the risk-averse investment strategy used by the fiduciaries of an employee stock ownership plan ("ESOP"). Plaintiffs seek to represent a class of present and former members of the ESOP. Presently before the Court is a Motion to Dismiss the First Amended Class Action Complaint filed on behalf of Defendants Aerotech, Inc. and the Aerotech ESOP Committee (collectively, Defendants or Aerotech) (Docket No. 29). The motion is fully briefed (Docket Nos. 30, 32, 33) and is ripe for decision.[1]

The amended complaint asserts the following claims: (Count I) breach of fiduciary duties under ERISA, 29 U.S.C. § 1104(a)(1); and (Count II) engaging in a prohibited transaction with a party in interest, in violation of ERISA, 29 U.S.C. § 1106(a)(1)(D). For the reasons set forth herein, the motion to dismiss will be denied in part as to Count I and granted in part as to Count II.

---

[1]  Because counsel for both sides have thoroughly and ably articulated their respective positions, the motion for oral argument (Docket No. 34) will be denied.

I.  **BACKGROUND**

The parties are well-acquainted with the factual background of this case so at this juncture the Court will present an abbreviated recitation of the facts relevant to the pending motion as alleged in the amended complaint (Docket No. 25) and in the light most favorable to Plaintiffs.

A. Allegations in the Amended Complaint

Aerotech has sponsored an ESOP since 1977. The ESOP Committee was established by the plan documents and directs the trustee on how to invest ESOP assets. Amended Complaint ¶ 6. Aerotech appoints and has power to remove members of the ESOP Committee. Amended Complaint ¶ 7. There are 450 current participants in the ESOP, and the average number of participants during the six-year ERISA limitations period[2] was 385. Amended Complaint ¶ 11.

Participants have no control over investment decisions. Amended Complaint ¶ 17. The ESOP has two types of assets: (1) Aerotech stock; and (2) a General Investments Account ("GIA").[3] Defendants' reply brief states that 80% of plan assets are held in Aerotech stock and the GIA is the remaining 20% (Docket No. 33 at 6). Each participant's account value is equal to their *pro rata* share of the ESOP's total asset value. Amended Complaint ¶¶ 14, 15.

Since 2009, Defendants have kept the GIA invested exclusively in assets on the lowest end of the risk-return spectrum, *i.e.*, money market funds and short-term certificates of deposit with a term of less than a year. Amended Complaint ¶ 19. Between June 2018 and June 2023, the GIA balance averaged $10.4 million. Amended Complaint ¶ 18. The average GIA balance for an ESOP participant was $28,000. Amended Complaint ¶ 48.

---

[2]  The original complaint in this case was filed on April 24, 2024.

[3]  The Amended Complaint refers to this account as an OIA, but Plaintiffs' briefing adopts the "GIA" nomenclature, which is consistent with the plan documents.

Aerotech chose to structure the ESOP as a retirement plan. Amended Complaint ¶ 29. Employee retirement plans are generally long-term investments. Amended Complaint ¶ 30. Due to being structured as a retirement plan, ESOP participants suffer a 10% penalty tax if they use their accounts before reaching retirement age and have the entirety of any such withdrawal taxed as income. Amended Complaint ¶ 31. ESOP participants are incentivized to hold their ESOP accounts until retirement by deferral of tax on account contributions and earnings. Amended Complaint ¶ 32.

Aerotech employs workers of all ages. The average Aerotech worker is about 20 years away from retirement and lacks sufficient savings for retirement. Amended Complaint ¶¶ 33-35. Aerotech employees work because they need regular income to support themselves and their families. The typical Aerotech worker does not have generational wealth or other assets set aside sufficient to support themselves in retirement. Amended Complaint ¶ 36. Accordingly, "ESOP participants have a long investment horizon and need their account values to grow in order to generate more retirement income." Amended Complaint ¶ 37. ESOP participants have a high tolerance for short-term market volatility and "need an investment strategy focused on long-term capital appreciation." Amended Complaint ¶ 37.

Investing in employer stock through an ESOP retirement plan is consistent with the purpose of providing long-term capital appreciation to participants. Amended Complaint ¶ 38. Aerotech does not provide matching contributions to employee 401(k) accounts because it supports retirement savings through the ESOP instead. Amended Complaint ¶ 39.

Notwithstanding participants' long-term investment horizon, Defendants keep the GIA invested exclusively in cash equivalents. Amended Complaint ¶ 41. There is a mismatch between Defendants' short-term investment strategy and participants' goal of long-term capital

appreciation. A prudent fiduciary would have been aware that average returns on riskier investments, such as stocks, significantly outperform average returns on cash equivalents over the long term. Amended Complaint ¶¶ 42-47 (over the last 150 years in advanced economies, cash equivalents outpace inflation by 1% while stocks outpace inflation by 7%). Plaintiffs assert that no prudent fiduciary would invest in cash equivalents for the long term. By pursuing a cash-only strategy, Defendants failed to tailor the GIA investment strategy to ESOP participants' time horizon and risk tolerance. Amended Complaint ¶ 51.

Plaintiffs allege that prudent ESOP fiduciaries acting under similar circumstances do not invest exclusively in cash equivalents. Amended Complaint ¶ 52. Instead, they invest excess (non-employer stock) funds in other assets that offer greater potential for long term appreciation. Amended Complaint ¶ 53. Plaintiffs offer as comparators the ESOPs of the Great Lakes Cheese Co. (95% of GIA assets in common stock); SCS Engineers (60% of GIA assets in common stock, 40% in real estate and bonds); and First American Bank Corp. (98% of GIA assets in diversified portfolio). Amended Complaint ¶ 54. Plaintiffs identify five other ESOPs that invest GIA funds in equity investments through mutual funds or professional asset managers. Amended Complaint ¶ 55.

Plaintiffs assert that the conservative, cash-equivalents strategy cannot be justified by the legal obligation of Aerotech (not the ESOP, *see* Amended Complaint ¶ 63) to offer departing participants the ability to sell their shares to the company at fair market value. Amended Complaint ¶ 57. The ESOP repurchased an average of $3.5 to $4.0 million per year in stock from departing employees from June 2018 to June 2023. Amended Complaint ¶ 60. The GIA balance during those years increased from $9 million to $12.2 million. Since 2009, new contributions and dividends have exceeded ESOP distributions every year but one. Amended Complaint ¶ 60. The

ESOP has been able to fund repurchases from current cash income and does not need to maintain the GIA as a multi-year backup reserve. Amended Complaint ¶ 61. Defendants do not have specific reasons to believe that current income will not be available to fund repurchases in the future. Amended Complaint ¶ 62. Plaintiffs assert that investments in stock index funds can be liquidated in a few days, if needed, and over the long term are a safer bet than cash equivalents to maximize funds for possible repurchases. Amended Complaint ¶ 64.

Plaintiffs assert there are numerous other ways Defendants could have managed their repurchase obligation other than leaving the GIA assets entirely in cash, including using a different method for repurchasing stock, releveraging in any year with inadequate funds, using funding sources other than cash within the GIA, using pooled funds with both long and short term investment objectives, or using mutual funds that offer materially the same liquidity as cash equivalents. Amended Complaint ¶¶ 65-68.

Plaintiffs allege: "The conduct of other fiduciaries demonstrates that prudent ESOP fiduciaries do not hold ESOP assets in cash to satisfy the company's repurchase obligation. Most ESOPs do not hold more than a de minimis amount of cash equivalents. Among all ESOPs with more than 100 participants at year-end 2022, the median cash holding was less than 0.10% of total plan assets. In contrast, the Aerotech ESOP held over 20% of its assets in cash or cash equivalents as of the end of each plan year between 2018 and 2023." Amended Complaint ¶ 70.

With respect to Count II, Plaintiffs allege that Defendants managed the GIA with an eye toward serving the company's interest to use the GIA for liability management, rather than to advance the interest of participants for asset appreciation. Amended Complaint ¶¶ 71-74.

B.     Consideration of Defendants' Exhibits

Defendants submitted a lengthy appendix to their opposition brief (Docket No. 30-1 to 11). It included, among other things, Aerotech plan documents; Exhibit H, Figure 1 (a chart of Aerotech's repurchase obligations from 2012-2022)[4]; and Exhibit I, Figures 2 and 3 (charts identifying other ESOPs which invest GIAs entirely in cash or cash equivalents). The data in Figures 1, 2 and 3 is derived from publicly available Form 5500s. Aerotech also submitted excerpts from its own Form 5500s.

Plaintiffs object to Exhibit I on the ground that it represents an "attorney-made compilation of acontextual data," without the underlying public records (Docket No. 32 at 21-22 & n. 6). Plaintiffs point out that Figure 3 omits two columns of information included in Figure 2. Plaintiffs also contend that the Form 5500s cannot be considered for the truth of their contents. In reply, Defendants note that courts regularly take judicial notice of Form 5500 data and explain that the court can review the underlying source material by entering the ID # for each plan into the Department of Labor search page (Docket No. 33 at 8 n. 5).

In reviewing a motion to dismiss, "a court may, in addition to the contents of the complaint, consider any attached exhibits and evidence beyond the complaint including public records . . . , documents essential to [plaintiff's] claim which are attached to defendant's motion, and items appearing in the record of the case." *Smith v. Lincoln Ben. Life Co.*, Civ. Action No. 08-01324, 2009 WL 789900, at *5 (W.D. Pa. Mar. 23, 2009) (internal citation and quotation marks omitted), *aff'd*, 395 F. App'x 821 (3d Cir. 2010).

In *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172 (3d Cir. 2024), defendants attached Form 5500s (reports that retirement funds must file annually with the federal government, 102

---

[4] Even considering Exhibit H, it appears that the Aerotech ESOP maintains a cash reserve that is nearly double the largest year's (2019) repurchase obligation. Plaintiffs' theory of a breach of fiduciary duty remains viable.

6

F.4th at 178) to their original motion to dismiss, which the plaintiffs drew upon in amending the complaint. The Court considered the Form 5500s because they were indisputably authentic, and the plaintiffs' claims were based on them. *Id.* at 179.

The Court need not definitively resolve the dispute in this case. Both sides submitted comparator ESOPs based on Form 5500 data. Both sides challenge the validity of those comparators and accuse the other side of cherry-picking data. In *Mator*, the Third Circuit emphasized that district courts, in evaluating comparators, must view the allegations in the light most favorable to plaintiffs. 102 F.4th at 187. Even if the Court considered Exhibit I, as explained below, it concludes that Defendants failed to articulate a natural, obvious or patently more reasonable explanation for their investment approach sufficient to grant their motion to dismiss. *Id.* at 184, 189.

## II.     RULE 12(b)(6) STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, the factual allegations contained in the complaint must be accepted as true and must be construed in the light most favorable to the plaintiff, and the Court must "'determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007). While Federal Rule of Civil Procedure 8(a)(2) requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief,'" the complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 555). Moreover, while this standard "does not require 'detailed factual allegations,'" Rule 8 "demands

7

more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). The Supreme Court has noted that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). Moreover, the requirement that a court accept as true all factual allegations does not extend to legal conclusions; thus, a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

To review a complaint under this standard, the Court proceeds in three steps. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). First, the Court notes the elements of a claim. *See Id.* (quoting *Iqbal*, 556 U.S. at 675). Second, the Court eliminates conclusory allegations. *See Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, the Court assumes the well-pleaded facts that are left are true and assesses "'whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Additionally, in the courts' consideration of whether claims – if they are to be dismissed – will be dismissed with prejudice, Federal Rule of Civil Procedure 15(a)(2) directs that leave to amend should be freely given "when justice so requires." Denial of leave to amend may be appropriate where there is "'undue delay, bad faith, dilatory motive, prejudice, and futility.'"

8

*Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).

### III.  UNIQUE CONSIDERATIONS FOR ERISA FIDUCIARY CLAIMS

In *Kruchten v. Ricoh USA, Inc.*, No. 23-1928, 2024 WL 3518308, at *2 (3d Cir. July 24, 2024) (reversing a district court's dismissal of a fiduciary duty claim[5]), the Third Circuit Court of Appeals explained that under *Twombly* and *Iqbal*, "evaluating plausibility requires a context-specific inquiry that includes the underlying substantive law." The Court explained some of that context with respect to motions to dismiss ERISA fiduciary duty claims:

> Under ERISA, fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope, 29 U.S.C. § 1104(a)(1)(B). When reading complaints, we look holistically across all of the allegations to see if the complaint plausibly alleges the fiduciary violated its duties. *Sweda [v. Univ. of Pennsylvania*, 923 F.3d 320, 331 (3d Cir. 2019)] (explaining that we must not "pars[e ERISA complaints] piece by piece to determine whether each allegation, in isolation, is plausible") (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)). At the same time, we must "give due regard to the range of reasonable judgments a fiduciary may make based on [its] experience and expertise." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).

*Id.* An allegation that the services market is commodified and competitive is not a mere "legal conclusion" that the courts must reject. *Id.* at *3. A defendant's contention that there are varying types of services which explains the different charges "is a factual claim that must be determined at a later stage in the case." *Id.* There is no magic level of disparity in the amount of fees paid; rather, "plaintiffs need to establish that the comparisons they provide are appropriate." *Id.* at *4.

The Third Circuit provided substantial guidance about the "standard for pleading an ERISA claim" in *Mator*, 102 F.4th at 172. *Mator*, like *Kruchten*, involved an allegation that the fiduciaries

---

[5]  Defendants rely on and cite only the district court opinion in their opposition brief (*see* Docket No. 30 at 22), which was filed a month after the Third Circuit decision was issued, and their reply brief (*see* Docket No. 33 at 7), which was filed several months later.

breached their duties by incurring excessive fees. The district court granted a motion to dismiss, finding the allegations conclusory, but the Third Circuit reversed that decision.

The Court explained that a higher pleading standard does not apply.

> In *Sweda*, we held that "*Twombly*'s discussion of alleged misconduct that is 'just as much in line with a wide swath of rational and competitive business strategy' is specific to antitrust cases." 923 F.3d at 326 (quoting *Twombly*, 550 U.S. at 554, 127 S.Ct. 1955). The Supreme Court recently abrogated that specific portion of *Sweda* by reiterating that in ERISA cases, courts are to "apply[ ] the pleading standard discussed in [*Iqbal*] and [*Twombly*]." *Hughes*, 595 U.S. at 177, 142 S.Ct. 737.

*Id.* at 184 n.3.[6]

The Court recognized that ERISA requires "careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Id.* at 183 (citation omitted). In other words, "ERISA furthers the distinct goals of safeguarding anticipated employee benefits and assuring a predictable set of liabilities for employers." *Id.* (citation and punctuation omitted). Courts must evaluate the allegations in the complaint bearing in mind ERISA's twin goals. *Id.* at 184.

"In addition to the legal context, the factual context is paramount." *Id.* at 184. The duty of prudence depends on the circumstances at the time the fiduciary acts. *Id.* (citations omitted). Although plaintiffs cannot recover for conduct beyond the 6-year limitations period, "it is proper for their allegations to encompass a longer time period to allow for the necessary context-specific analysis." *Id.* at 188.

The Court explained: "The circumstances confronting a fiduciary sometimes require difficult tradeoffs, so courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Id.* at 184. To survive a motion to dismiss, "a plaintiff must plausibly allege fiduciary decisions outside a range of reasonableness." *Id.* "[A]

---

[6] The *Mator* Court followed *Sweda* in all other respects.

plaintiff alleging an ERISA fiduciary breach need not rule out every possible lawful explanation for the conduct he challenges." *Id.* (citation omitted). On the other hand, the Court in *Mator* instructed: "the Rules require dismissal when fiduciary defendants offer an alternative explanation for their conduct that is "obvious," "natural," or simply "more likely" than the plaintiff's theory of misconduct." *Id.* The Court expounded on this principle:

> We agree that "[s]ometimes an alternative explanation for an ERISA fiduciary's conduct may be patently more reasonable and better supported by the [alleged] facts than any theory of fiduciary duty violation pleaded by a plaintiff," and in those circumstances "courts should not hesitate to dismiss." *Hughes*, 63 F.4th at 630. But Wesco's alternative explanation is not more reasonable or better supported than the Mators' theory of misconduct, given the magnitude of the differences in fees— about two to four times what comparable plans paid.

*Id.* at 189.

The Supreme Court's unanimous decision in *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (involving allegation that ESOP plan fiduciaries violated duty of prudence by continuing to buy company stock despite knowing it was overvalued), is also instructive. In *Dudenhoeffer*, the defendants made arguments similar to some of those made by Aerotech in this case.

The Supreme Court held that "ESOP fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general, except that they need not diversify the fund's assets." *Id.* at 412. The Court rejected the argument that ERISA created a "special presumption favoring ESOP fiduciaries." *Id.* at 418. ESOP fiduciaries are not liable for losses that result from a failure to diversify beyond that company's stock, "[b]ut aside from that distinction, because ESOP fiduciaries are ERISA fiduciaries and because § 1104(a)(1)(B)'s duty of prudence applies to all ERISA fiduciaries, ESOP fiduciaries are subject to the duty of prudence just as other ERISA fiduciaries are." *Id.* at 419.

The Court rejected the argument "that the special purpose of an ESOP—investing participants' savings in the stock of their employer—calls for a presumption that such investments are prudent." *Id.* at 419-20. The nonpecuniary goal of increasing employee stock ownership does not excuse compliance with the "'exclusive purpose' to be pursued by all ERISA fiduciaries: 'providing [financial] benefits to participants and their beneficiaries' while 'defraying reasonable expenses of administering the plan.'" *Id.* at 420 (quoting § 1104).

The Supreme Court was not persuaded by the argument that "without some sort of special presumption, the threat of costly duty-of-prudence lawsuits will deter companies from offering ESOPs to their employees, contrary to the stated intent of Congress." *Id.* at 423. The Court recognized that Congress sought to encourage the creation of ESOPs and ERISA reflects a careful balancing between ensuring rights under a plan and encouraging creation of such plans. *Id.* at 424. The Court, however, concluded that a special presumption was not an appropriate way to weed out meritless, economically burdensome lawsuits. "That important task can be better accomplished through careful, context-sensitive scrutiny of a complaint's allegations" in the context of a motion to dismiss for failure to state a claim. *Id.* at 425; *accord Sweda* 923 F.3d at 334 (rejecting defendants' request for a presumption of prudence despite appreciation of the defendants' and amici's fear of frivolous litigation and reversing district court's dismissal of claim).

IV. **DISCUSSION**

A. Count I

In Count I, Plaintiffs allege that the ESOP Committee breached its fiduciary duty of prudence under ERISA § 1104 and Aerotech failed to monitor that conduct. The parties agree that

whether the "failure to monitor" claim survives the motion to dismiss is derivative of whether the underlying breach of fiduciary duty claim survives. *Id.*

Under ERISA, fiduciaries are held to the "prudent man" standard of care, which is drawn from trust law. *Sweda*, 923 F.3d at 327 (citations omitted). "Section 1104(a) lays the foundation of fiduciary duty, and § 1106(a) supplements that foundational obligation by erecting a categorical bar to transactions between the plan and a 'party in interest' deemed likely to injure the plan." *Id.* (citation and punctuation omitted). The standards for fiduciary conduct in §§ 1104 and 1106 may overlap. *Id.*

The elements of an ERISA breach of fiduciary duty claim are: "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan." *Mator*, 102 F.4th at 184. A fiduciary "must prudently select investments." *Sweda*, 923 F.3d at 328. A failure to monitor investments and remove imprudent ones may also constitute a breach of fiduciary duty. *Mator*, 102 F.4th at 191 (citations omitted).

The Court in *Mator* summarized the fiduciary duty owed by plan administrators:

> A fiduciary must administer the plan "solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a **like character and with like aims**." *Id.* § 1104(a)(1). "A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions."

*Id.* at 183 (emphasis added).

In this case, as in *Mator*, the primary dispute is whether there was a breach of the duty of prudence.[7] Whether a fiduciary breached its duty of prudence is primarily a question of fact.

---

[7] Defendants do not contest their status as fiduciaries. Plaintiffs plausibly alleged the existence of damages, although calculating damages may present difficulties and the Court is skeptical that damages can be calculated based on market appreciation in hindsight.

*Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 541 F. Supp. 3d 496, 510–11 (D.N.J. 2021) ("Although hindsight cannot play a role in determining whether a fiduciary's actions were prudent, many allegations concerning fiduciary conduct are factual questions not properly addressed at the motion to dismiss stage.") (citations omitted).  Courts must focus on the "process rather than results" and determine whether a fiduciary "employed the appropriate methods to investigate and determine the merits of a particular investment." *Sweda*, 923 F.3d at 333.

In *Sweda*, the Court explained:

> [W]hile fiduciaries have discretion in plan management, that discretion is bounded by the prudent man standard. Discretion "does not mean ... that the legal standard of prudence is without substantive content or that there are no principles by which the fiduciary's conduct may be guided and judged," rather a fiduciary's conduct at all times "must be reasonably supported in concept and must be implemented with proper care, skill, and caution."

*Id.*  The Court emphasized that "ERISA fiduciaries have a duty to act prudently according to current practices—as the statute puts it, the 'circumstances then prevailing.' 29 U.S.C. § 1104(a)(1)(B)." *Id.* at 330.

Defendants argue that they successfully manage a mature, 50-year-old ESOP, make voluntary yearly contributions, recycle shares, and conservatively invest to ensure sufficient funds for the future.  In *Sweda*, the Court explained that an argument that the fiduciary did in fact employ a prudent process "goes to the merits and is misplaced at this early stage." *Id.*  Defendants also seek to justify their conduct based on the unique fiduciary considerations that apply to ESOPs (an argument that was rejected in *Dudenhoeffer*, as discussed above).

Defendants argue that Plaintiffs represent a subset of employees who are trying to force the ESOP to gamble in risky, illiquid investments.  They also point to factors unique to the

Aerotech ESOP.[8] In essence, Defendants maintain that their investment strategy was prudent and that the Court cannot infer an imprudent process from the allegations in the Amended Complaint.

Plaintiffs contend that the investment strategy adopted by Defendants is fundamentally flawed by failing to look at an appropriate investment time horizon. They argue the "all cash" GIA investment strategy helps Aerotech meet its corporate duty to redeem/recycle shares, but violates the fiduciary duty to ESOP plan participants to prudently invest for capital appreciation appropriate for a retirement plan. Plaintiffs point out that it is possible for an ESOP to recycle shares <u>and</u> invest the GIA in higher return investments. Plaintiffs cite numerous ESOP comparators that hold only de minimis amounts of cash. Plaintiffs argue that Defendants do not need to maximize funds, but merely act with the same care, skill and diligence as a similarly-situated loyal fiduciary. This duty includes considering the time horizon, risk tolerance and need for asset appreciation of the Plan participants.

In this case, as in *Mator*, "[m]uch of the dispute about the sufficiency of the complaint turns on whether it provides apples-to-apples comparisons between the Plan and other plans." 102 F.4th at 181. In *Mator*, after several amendments, the plaintiffs alleged that either the Plan's direct fees alone or its indirect fees alone were unreasonable compared to similar plans. The plaintiffs also pleaded that the Plan switched service providers and paid a much lower fee without a decline in quality. *Id.* The Court in *Mator* concluded that the comparators set forth in that case, although not perfect, provided sufficient context to make the claim plausible and disagreed with the district court's view that the plaintiffs provided only a side by side list rather than an apples to apples

---

[8] One specific example is § 8.01 of the Plan, which provides for vested distributions to participants (i) at age 65, whether or not they retire; (ii) after 10 years in the Plan after age 55; and (iii) when they separate from the company (Docket No. 30 at 13). The Court observes that the first two categories generally involve a long time horizon. The third category could be short term, although the amounts involved for a short term employee would be expected to be smaller.

15

comparison. The Court commented: "Although reasonable fiduciaries need not prioritize cost minimization above all else, there is enough evidence alleged here of a failure to act prudently." *Id.* at 185. The Court observed that it was unaware of any authority "on how close comparators must be in size" and four comparators were sufficient. *Id.* at 186-87. The Court declined to adopt any bright line rules on the number or size of comparators. In addition, it reiterated that the district court, in evaluating comparators, must view the allegations in the light most favorable to the plaintiffs. *Id.* at 187.

In this case, Plaintiffs identified evidence to support their allegation that the Aerotech ESOP held nearly 200 times as much cash as comparator ESOP plans, which resulted in a significant reduction in asset appreciation in the Aerotech ESOP. That vast disparity supports a reasonable inference of a lack of prudence. Plaintiffs also plausibly allege that Defendants unquestioningly adhered to the "all cash" philosophy for many years (since 2009), despite changing external market conditions and internal fluctuations in expected recycling obligations.

The Court acknowledges that Aerotech identified comparator ESOP plans that employed similar cash-intensive strategies. Aerotech, ultimately, may be able to demonstrate that its actions were prudent. Markets and company stock values do not always go up. The Court notes that Plaintiffs' references to the 2009-2023 timeframe conveniently omit the drastic market crash that occurred in 2008. The scenario described in *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671 (7th Cir. 2014), in which a company's efforts to pay a wave of ESOP redemptions drove it into bankruptcy, which rendered the ESOP worthless, is a sobering cautionary tale.

The specific factual context of the Aerotech ESOP may justify the cash equivalent strategy, including, for example, its share price outlook, anticipated retirements or separations of participants, expected payout amounts, etc. *See* Docket No. 30 at 22. Those (currently unknown)

16

facts, however, are not apparent from the Amended Complaint and would not be appropriate for consideration at this stage of the case.

In sum, the Court will deny the motion to dismiss count 1. Numerous appellate decisions, including *Dudenhoeffer*, *Kruchten*, *Mator* and *Sweda*, have reversed district court decisions which granted similar motions to dismiss. In this case, Plaintiffs pleaded a plausible breach of the duty of prudence by the Aerotech Plan. Because that claim survives, the duty to monitor claim against Aerotech also survives.

B. Count II

In Count II, Plaintiffs allege that Defendants engaged in a prohibited transaction under ERISA § 1106(a)(1)(D). Defendants argue that the amended complaint fails to allege the elements of a §1106(a) claim because Plaintiffs did not identify a "transaction" that presents risks to ESOP participants. In the alternative, Defendants contend that an exception to a § 1106 claim is apparent on the face of the amended complaint because ERISA § 1108 expressly permits an ESOP to assume responsibility for share repurchases to facilitate recycling.

Plaintiffs explain that the alleged prohibited transaction is the investment of GIA funds in low-yield cash equivalents for the benefit of Aerotech, the plan sponsor. Plaintiffs argue that Defendants' reliance on § 1108 is misplaced and irrelevant because they are not alleging that repurchasing/recycling is a prohibited transaction. Instead, they focus on the investments in cash equivalents to support Aerotech's cash flow and tax liabilities, to the detriment of asset appreciation for ESOP participants. In reply, Defendants maintain that their "cash only" investment philosophy does not constitute the kind of "transaction" Congress intended to prohibit.

Section 1106(a) supplements the fiduciary duties in § 1104 by specifically prohibiting certain transactions between plans and parties in interest. The elements of a party-in-interest,

prohibited transaction claim are: (1) the fiduciary causes (2) a listed transaction to occur (3) between the plan and a party in interest. 29 U.S.C. § 1106(a)(1). ERISA defines "party in interest" as "a person providing services to such plan." 29 U.S.C. § 1002(14)(B). *Sweda*, 923 F.3d at 335.

> The statute identifies prohibited transactions:
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest; (B) lending of money or other extension of credit between the plan and a party in interest; (C) furnishing of goods, services, or facilities between the plan and a party in interest; (D) **transfer to, or use by or for the benefit of a party in interest, of any assets of the plan**; or (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

§ 1106(a)(1) (emphasis added).

> The Court in *Sweda* further explained, with respect to subsection D:
>
> We have interpreted § 1106(a)(1)(D) similarly, holding that a violation occurs when: (1) a fiduciary, (2) causes a plan to engage in a transaction, (3) that uses plan assets, (4) for the benefit of a party in interest, and (5) "the fiduciary 'knows or should know' that elements three and four are satisfied." *Reich v. Compton*, 57 F.3d 270, 278 (3d Cir. 1995). In *Reich*, we held that specific intent is required because of the plain meaning of the statutory phrase "for the benefit," and also because if § 1106(a)(1)(D) did not require "subjective intent to benefit a party in interest, [it] would produce unreasonable consequences that we feel confident Congress could not have wanted." *Id.* at 279.

923 F.3d at 337-38.

The ERISA statute does not expressly define the term "transaction." In *David v. Alphin*, 704 F.3d 327, 340 (4th Cir. 2013) (involving an allegation that the fiduciaries failed to evaluate and remove underperforming funds), the Court explained: "The common understanding of the word 'transaction' implies that an affirmative action is required. (*See* Meriam Webster dictionary: 'transaction: 1) a: something transacted; especially: an exchange or transfer of goods, services, or funds; ... 2) a: an act, process, or instance of transacting.')." "Courts have held that a decision to continue certain investments, or a defendant's failure to act, cannot constitute a 'transaction' for

purposes of section 406(a) or 406(b)." *Id.* The Court quoted *Wright v. Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004), for the proposition that a decision "to continue to hold 15% of Plan assets in employer stock was not a 'transaction.'" *Id.*

The Court in *David* held that the "only action that can support an alleged prohibited transaction is the initial selection of the affiliated funds." *Id.* at 341. The Court rejected the argument that "failure to remove the affiliated funds at every committee meeting constituted a new 'prohibited transaction,' and thus, a breach of fiduciary duty." *Id. Accord Fleming v. Rollins, Inc.*, 655 F. Supp. 3d 1243, 1270 (N.D. Ga. 2023) ("It is well-established that only the original initiation of a prohibited transaction—not any subsequent omission or failure to correct the transaction—gives rise to a cause of action pursuant to 29 U.S.C. § 1106(a) or (b).") (citing *David*).

The transactions itemized in § 1106(a) involve rather discrete acts, i.e., sale or leasing of property; lending of money or other extension of credit; furnishing goods or services; and acquisition of employer security or real property. Here, Plaintiffs allege that Defendants "pursu[ed] a principal preservation" strategy for many years. Amended Complaint ¶ 102. That is different in kind than the transactions identified in the statute and similar to the conduct at issue in *David*. As in *David*, Aerotech's initial decision in 2009 to pursue a "cash only" strategy occurred beyond the limitations period and Defendants simply adhered to that strategy since that time. There was no actionable "transaction" under the facts pleaded in the Amended Complaint. Accordingly, the motion to dismiss count II will be granted.

## V.     CONCLUSION

For the reasons set forth above, the Motion to Dismiss (Docket No. 29) will be granted in part, with respect to Count II, and denied in all other respects. Defendants shall file an answer by

March 21, 2025, and will have ample opportunity to renew their challenges to Count I based on a fully-developed evidentiary record.

An appropriate Order follows.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Dated: February 20, 2025

cc/ecf: All counsel of record